Chief Joe Stewart, my name is David Neal McCarty of Jackson, Mississippi, and along with my lead counsel, Malcolm Harrison, we represent the appellant, Ms. Stacey Roy. For multiple reasons, the grant of summary judgment in this employment case must be reversed. The key issue here, over and again, is that we provided page after page of pretext. And pretext is the key throughout this case. First, the medical center retaliated against Ms. Roy when she filed a charge of discrimination with the EEOC. I thought she was riffed before that. Your Honor, she was not. It was four days, Judge Clement, after she filed her charge with the EEOC, that she... They didn't know. There was some allegation they didn't know about it, right? Your Honor, there is... What we provided in the record is proof that she was told just days before she filed her EEOC complaint, the person who ran the medical center, Judge, Dr. Cruz, had given her a general assurance of safety. In fact, the phrase Dr. Cruz used to Ms. Roy was, I'm going to use everything in my power to keep from laying people off. But she didn't know about the EEOC complaint at the time. It had not been filed yet, Judge. The only thing that changed from that guarantee of safety in the week later of her being fired, the only thing that changed was that she went to the EEOC over gender discrimination. So a reasonable jury, Your Honor, could have concluded that the fact that her supervisor, the person who was in charge of the whole medical center, or this department of the medical center, had given her that general assurance of safety. And it wasn't just a sort of vague, we're going to take care of you, Judge. It included a specific plan of action. Because what Dr. Cruz admitted in her testimony to say was that they had a plan to avoid layoffs. This was not, Your Honor, a requirement from the legislature, because the medical center division she worked at is publicly funded. This was not a requirement from the legislature that they shutter the division or that they lay people off. It was a budget reduction. 100 percent, which is very significant. Frankly, Judge Jones, I think it was 21 percent. It was significant, Your Honor. However, there was a specific plan, Judge Jones, that they, while they knew the budget cut was coming, they had a plan to keep there from being layoffs. Ms. Roy actually testified that after she had had the conversation with Dr. Cruz, she thought no one would get laid off. They had a specific plan of action. So it wasn't just that they generally were going to try to make promises not to lay people off. That specific plan was they were going to shut down satellite locations. Because the way this worked was they had most of their main employees, Judge, in Jackson. That's where Ms. Roy was located in Jackson, Mississippi, along with the other people who worked to try to keep patients from smoking. It was part of a general plan for what they call tobacco cessation. The legislature had begun to cut the budget towards stopping tobacco usage. So they knew this was coming, Your Honor. And they had told Ms. Roy, we're going to try to keep you safe. And a reasonable jury could have concluded then that the fact that 96 hours before she was fired, she went to the EEOC, this was pretextual. And that's exactly what this court, or a different panel of this court, rather, just two years ago in Porter v. Homo Terribone Housing Authority concluded, that that very close proximity, that very close proximity can show a prima facie evidence of retaliation. Now in that case, it was as long as six and a half weeks that the court concluded could manifest itself as prima facie retaliation. Here we can measure it not just in weeks, but in hours. This is, the EEOC complaint was about what, her failure to be promoted, right? Yes, Your Honor. It was based heavily on gender bias, that Ms. Roy had alleged that men in the workforce, specifically the men tobacco cessation specialists, were treated differently than the women. There were two men and two women. And that's important, Judge Jones, because one of the other issues with the pretext in our record was the fact that these two men had been secretly promoted over the women. While the medical center had a pattern in practice of it would always post new positions, certainly when they were opening a new position, or new opportunities for promotion, Judge Jones, they did not do that in this case. So a reasonable jury could have concluded that she suffered gender discrimination when they passed her over for promotion, because they didn't even post the job, it didn't publicize the position, and then it not only secretly promoted the two men, it kept it secret. The medical center kept it secret for five months. And this is all ongoing at the same time, while they know that the legislature's budget cut is going to have to be implemented. A reasonable jury could have looked at this and concluded this was pretext. Their reason here wasn't that they had a budget cut. Their reason is that they were keeping her down in the workforce, and then when she complained about gender discrimination, they ejected her. Looking at the evidence most favorable to Ms. Roy, as we were bound to do in the district court, and of course this court does as well, there was key information that was not included in the district court's analysis. It was in our record, but it was not viewed at all, let alone in the light most favorable to Ms. Roy. In the district court's lengthy and very detailed opinion, it did not include these general assurances of safety from Dr. Cruz, the supervisor of the department, and it did not note, as must be noted, that there was even a plan of action to keep people from being laid off. It's also important that the district court's full analysis was only on the reduction of force policy. This is a general plan they adopted several years before. These layoffs happened in 2012. The general RIF plan, as they call it, was in 2009. The general plan then is keep the senior employees and eject the junior employees. However, the district court focused exclusively on that 2009 plan, but ignored that they didn't have to lay off anybody at all, and there was testimony not just from Dr. Cruz, who was the supervisor of the whole division, but also Dr. Pang, who is in charge, it appears from the record, more of hiring and firing, even though Dr. Cruz had the ultimate authority. Now, why are you saying they didn't have to lay anyone off? Are you talking about in the main medical center, or as opposed to the satellites, or what do you say? In other words, they could, they had a choice to make as to whom to lay off. Is that what you're saying? Your Honor, they not only had a choice to make as to who they laid off, and Ms. Roy was not the only employee who was laid off, although she was the only one in the record that we know of who had complained about gender discrimination or engaged in protective activity. But there was evidence in the record, Judge Jones, that while they were having that 21% budget reduction, it didn't have to result in layoffs. And that was part of what Dr. Cruz had told Ms. Roy, was that she wanted to take care of the employees in Jackson. When we're talking about the satellite locations, Your Honor, we're talking about rental space, because Jackson is, or rather, Mississippi is so predominantly rural, you often would have the staff focused in Jackson. They would then travel to rural areas to provide these smoking cessation counseling, provide prescriptions to the people in the rural communities. So the plan, as Dr. Cruz had articulated it, and as she admitted in her deposition testimony, was we're going to start shutting down these satellites. Part of that, Your Honor, was because, in our record, one of the ways they were going to focus their budget reduction is they were going to reduce their patient workload. So they were seeing 1,000 patients at the time, Your Honor, before the budget cut from the legislature. They were going to reduce that to 700. And by reducing that patient workload, they were then going to start shuttering some of these rental offices. That was part of the ultimate plan they used. So again, looking at the light, looking at all this evidence in the light most favorable to Ms. Roy, because they partially implemented the plan they had told her about, a reasonable jury could have concluded this was pretext, and the only thing that changed was that she went to the EEOC about gender bias. Basically you want a jury to infer that they changed the whole realm of what they were planning to do with a budget cut solely so they could get rid of Ms. Roy? Your Honor, if we went to a jury, that issue would be the credibility of the supervisors versus what Ms. Roy's recollection of these conversations would be. But I mean, the only alternative for them that would have, in your view, would have been to not shut, to keep the staff at the center in Jackson and shut down more of the local offices. Is that what you're saying? That's true, Your Honor. Okay. Now, were the local offices staffed? Your Honor, it's unclear from the record. They were just little places that you went and sat down with the patients when you drove out into the countryside. That's closer to it, Judge. The three people who were ultimately laid off here were the two women, the two women tobacco cessation specialists. They kept the two men, and they also laid off an administrative assistant. So, the fact that a jury could reasonably look at this information, Your Honor, and conclude there were other ways of administering the budget cut, that's the most important thing here, Your Honor. And if we were after a jury trial of Judge Jones, this case would be a lot harder. Because if a jury found against us and said we didn't think there was retaliation, then our hands would be tied. It would be much more difficult. The difference here being that at the summary judgment level, our burden under Burlington and Shackleford was just to bring forth evidence that their reason for firing her was pretextual. What does the summary judgment record consist of from the standpoint of deposition testimony? Your Honor, it does not have the full deposition testimony. What it does have is selected excerpts from the deposition of Dr. Karen Cruz, who was the director of this division of the University of Mississippi Medical Center. It does have selections from the testimony of Ms. Roy. It also has affidavits from Molly Brasfield, who was the director of Human Resources, and from Dr. Payne, who was in charge of hiring and firing at this department. So, it's very substantial, Your Honor. It runs almost 1,000 pages. This was a very hotly litigated case on both sides with just, frankly, reams of testimony. That's another reason, Chief Judge, that summary judgment should not have been granted on the failure to promote issue. Where we allege that she engaged or she encountered gender bias because there was so much information in the record that the failure to even give her the opportunity to try out for this job. If you look at this evidence and elect most favorable to her, then summary judgment should not have been granted on that point. The district court focused, in part perhaps because it was such a large record, the district court focused exclusively on an experience requirement. And the experience requirement in what they call the JDQ, the job description questionnaire, had a general experience requirement of five years. Now, after Ms. Roy learned that there was the secret promotion, because she did not know about it, we have information in the record in form of a memo from Human Resources that said, you need to tell everybody you promoted the two men. You need to tell everybody that there's a different work chart now, or organizational chart, because the two men are now above the two women. Especially because Ms. Roy has been emailing Human Resources about gender bias. Well, they're not, they're, I mean, did they get increases in pay? They did, Your Honor. Okay, but as I understood it, what happened was that the other lady left, and then they divided her responsibilities among the two most senior people. Your Honor, what they did when Dr. Sutton left the medical center, what they did then was say, we're going to spread her duties, and we're going to make these two new senior positions. But, Your Honor, the key thing here, Judge Jones, is that they didn't tell anyone they were going to do this. Even though there was nearly a six-page long job description questionnaire, with things like, you have to have a master's degree in health services, you need to have a certificate in tobacco cessation training, they didn't solicit or promote the fact that they were going to make this brand new position. So in the brief that we have, the frankly excellent brief from the medical center, they urge that this is sort of like an adjunct professor moving to tenure track. The difference is, from that analogy, there would have been no tenure track. As the first page of the job description questionnaire says, they are creating a new position in order to fill the void left from the former doctor. This was a brand new position, and a jury could reasonably infer that failing to promote it or publicize it as they had in the past was pretext to keep Ms. Roy out of the promotion process, to keep her out of being considered. Now, so that's the gender discrimination. That's gender discrimination. Yes, Your Honor, it is. All right, so the head of the department was a female. She was. So you're going to persuade the jury that even though she left, presumably voluntarily, they're now trying to keep down a female. Judge, that would be our burden at trial. Would it be a difficult one, Judge Jones? It will be. But the difference between that ultimate push that we're going to have to make at trial, Your Honor, and here at summary judgment is we have to take, unlike a jury, here the district court should have taken all evidence in the light most favorable to her. And there was evidence in this record that Dr. Payne said, but for her not having five years' worth of experience, perhaps she could have been promoted. In fact, the record shows that Dr. Cruz and Dr. Payne agreed. She was a, quote, very good employee. She had no disciplinary history, had a master's degree. Why don't you discuss the difference between the five years as a tobacco treatment specialist that the two men had, where she did not have that specialist? Judge Clement, it's uncontested that the men had more specific job experience than her. However, the job description questionnaire, Your Honor, and even Dr. Payne's affidavit, that was not the requirement for this new job. It did not say, although the district court ruled this way, Your Honor, it did not say that you have to have five years of experience in this specialized field. In fact, Judge Clement, what it said was you have to have five years' health services. And what's so important about that five years is two things. First of all, Ms. Roy, looking at all of her experience, and if this had just been posted up on the bulletin board in the workroom or taped up on the door, she had five years of experience. She had four years and 11 months just with the medical center, Your Honor. Well, three years of those were in neuroscience research, right? It was, Your Honor. What does that have to do with tobacco treatment? Your Honor, it doesn't have anything to do with it, but the job description questionnaire didn't require specific experience in that specific field. Well, there's a dispute over that for sure. Your Honor, I think that certainly counsel— That's a form, right? It is a form, Judge. But the form, though, was part of a larger—this six pages of the job description questionnaire, they could have clearly input in, Your Honor, if they wanted to make it a specific requirement, it could have been. But looking at the evidence in the light most favorable to her, they did not make that specific choice and instead left the field a general requirement for experience. Well, they made the choice. They chose the two men who had specialized treatment for five years, whereas she had some other general treatment, not even focused on the issue that they were trying to resolve. Chief Judge, I see my time has elapsed. May I briefly respond to Judge Clement? Sure. Your Honor, they did make that choice. But looking at the evidence in the light most favorable to her, they never gave her the opportunity to even try out for the job. And a reasonable jury could conclude, then, this was pretext, in part because they selected a general bar of experience that would have left her out by one month by the experience she had at the medical center. And looking at this information in the light most favorable to Ms. Roy, as we're bound to do, this was pretext and it should have gone to trial. All right, Mr. Scardi, we've got your opening.  Mr. Whitfield? May it please the Court. I'm Tommy Whitfield. I'm here on behalf of the University Medical Center and Dr. Karen Cruz. I'd like to point out that there's no issues related to Dr. Cruz on appeal. The only three issues are related to the medical center itself. And I'd start with there were three issues on appeal, the first being that there's a claim of gender discrimination for her not being promoted to the position of senior tobacco treatment specialist. The Court, as it is acknowledged, this position required five years of experience as a tobacco treatment specialist. Where does it say that? It was in Dr. Payne's affidavit that this position was – and the way this position was – He says five years, but he doesn't really specify five years as a tobacco specialist. My reading of his affidavit, Your Honor, and our interpretation of his affidavit is that this position was created. And this isn't a singular position. This is a new job classification that was created. And this classification was created for those people who have been hired as a tobacco treatment specialist who have achieved the number of years of experience, which was five. And then also there were two subjective qualifications being capability to oversee different clinical aspects. And there was another one, but those were subjective. But at the base qualification, the objective qualification was you had to have the five years of experience. The Human Resources Department, when implementing this, looked at the workforce, including Ms. Roy. And the only two people that were tobacco treatment specialists that met this minimum criteria of five years were the two male specialists. Were they planning to make that position for two people? No. No, Your Honor. The position was open for anybody that qualified. And that's the difference between the Oden case that was cited in the plaintiff's response. In Oden, you had two deputies, Jesse Oden and George Carruthers, that were both trying to be the chief deputy. And they were both applying for the same position. Here we have multiple positions available. If you met the qualifications, you get promoted up. And so there wasn't just one position. There was multiple positions available if you met the qualifications for promotion. If you had one month more. No, Your Honor. If she would have had a year and a half more. A year and a half more is your position. She had four years, 11 months total with the medical center. But she only had three and a half years at the tobacco treatment center. Right. And so the district court, following Oden, held that she did not establish a prima facie case because she did not meet the objective qualifications. And the court didn't even get into the pretext analysis because on the burden-shifting framework, she did not establish her prima facie case, and the court granted summary judgment on that issue. The five years, at least in the description, doesn't say tobacco specialist. You say, well, it's clarified in the affidavit. Counsel's argument is, and under Rule 56, if you construe the evidence in the light most favorable to the non-moving, that might not be a winning argument down the road, but at least on a piece of paper that doesn't say what one now says it meant. If construed that way, why wouldn't that just be another disputed matter? You might win, not you, but the university, that ultimately this is what was meant. But it clearly doesn't say that, and they certainly could have said five years tobacco specialist as opposed to five years. Your Honor, I recognize the issue with the job description questionnaire. And as I pointed out in our brief, that is a computer-generated form that was submitted for these two people to move into the new job title. The position in the affidavit of Ms. Brasfield and Dr. Payne say that we looked at the contours of the position. We created it. We examined our workforce. We determined that these were the only two people that met the qualification of the five-year experience, and therefore they got the promotion. There's no inference of any type of pretext or discrimination in this analysis, that they objectively looked at the requirements and found that she did not. If they had promoted other people to the position that did not meet the requirements, then there would be an argument for this was a gender discrimination pretext issue. Nobody was promoted to the senior position or elevated to the senior position that did not have the minimum requirements stated. Dr. Payne, I find unusual that his name is Payne, even though it's spelled differently, but I do have a friend who's a surgeon named Dr. Butcher, so I don't know. The affidavit says this is an advancement opportunity for anyone hired as a tobacco treatment specialist, hired as a tobacco treatment specialist, who achieved the number of years. And in the next sentence it says it was determined that five years was the appropriate amount of experience. So why doesn't that support your position that even though the form was a little vague, this nails it down? That is our position. That does nail it down. And that affidavit, along with the affidavit of Ms. Brasfield, where they examined our workforce, Ms. Brasfield is our human resource business partner who is responsible for helping implement and oversee our policies for human resources, and she's the one that examined our workforce and said these are the people that have met the qualifications to be elevated to senior tobacco treatment specialist and these are the people who have not. That also goes directly into the next issue, which is the reduction in force. Ms. Brasfield, again, provides the rules following UMC policy as to how positions are going to be eliminated. This was a very substantial cut in funding to the Tobacco Treatment Center. It was closer to 20 to 25 percent of our annual budget. I think we had a 1.6 annual budget, and this was close to a $400,000 deduction. The grant is administered by the Department of Health, who sets the scope of work for what they want to see achieved under the grant. And it's undisputed in the record that they wanted us to see less patients and focus more on outreach. And to clarify what was said earlier, the patients are seen at the main branch, which is UMC itself. At UMC, we were dropping our patient load from 1,000 to between 500 and 700. So what happens at the satellite? That's more of an educational outreach area. We have people that go out in the field and deliver materials, and there are people on site at these clinics, but they're not our patients. No patients? People come to the patients go there, but they're not treated by our internal staff. Our staff goes out and provides support work for these clinics, but we're not actually treating patients outside of the main center. They have people at local hospitals and clinics there that provide that type of support. So based on that, with the reduction in patient flow, we didn't have a need for four treatment specialists at the medical center. And to go back to Your Honor's point earlier, the RIF plan was submitted on May 30th, which was five days before Ms. Roy filed her EEOC charge. That's when the plan was submitted to Human Resources for final approval. And it was finally approved on June 5th, which was the very next day. Now it was submitted, nobody at the med centers on that time in the Human Resources Department as Barbara Smith did not have knowledge of the EEOC charge, plus it was submitted before the EEOC charge was ever filed, which negates this whole argument of pretext being that the whole plan changed because she filed an EEOC charge on June 4th. The plan was already submitted in writing on May 30th. The plan called for the reduction from four tobacco treatment specialists down to two. And the policy that was the 2009 policy that was referenced is our global university-wide RIF policy for reductions in force. It's not a specific policy to the tobacco treatment center. It's a policy that deals with all reductions in force at the medical center. And that policy requires that when a single job classification or category is targeted, the seniority rule applies. And seniority is defined as years of service with the medical center, and you get credit for all cumulative years of service. There's no dispute that the two tobacco treatment specialists that were trained, Robert Locke and Anthony Davis, had more cumulative years of service with the medical center. They all had over seven years. As Mr. McCarty pointed out, Ms. Roy only had four years, 11 months. And the other tobacco treatment specialists had less than that time at the medical center. So based on our policy, implemented according to the policy, the two least senior tobacco treatment specialists were let go in the reduction in force. They didn't have the seniority and accorded our policy. There's two positions. If you had four, how many tobacco treatment specialists did you have? There were four total. Four, seeing 1,000 patients, and you went down to two seeing 700 patients? Yes, Your Honor. Plus having other responsibilities? Yes, Your Honor. That's a pretty severe change in procedures. It was a pretty severe cut in funding that we had to account for, reduce patient costs, reduce medicine costs, and to focus more on our outreach efforts. When do these patients come in? That I don't know, Your Honor. He's saying that you could have reduced rent in some of your facilities elsewhere. Your Honor, we could have done probably a lot of different things. But the business justification, the business need of our department is analyzed by the people that run it. And to compensate for what they thought was the best way to handle this budget cut is for the elimination of the two tobacco treatment specialists and the reduction of medical costs and all of the reduced patient load that's going to be had at the center. That's a legitimate, non-discriminatory reason for our actions. As I read the case law, it's not the court's position to second-guess business decisions. It's to look for the inference of discrimination. And there is no inference in this case because, as we pointed out, their main argument is that this is all pretext because she filed an EEOC charge. Well, the record shows that this plan was put into place before she filed her EEOC charge. And while Dr. Cruz, the program director, did say she would do everything within her power to prevent people from losing their jobs, the necessity of the department and the necessity of the cut, they went in a different direction. Isn't there also a claim for a failure to rehire? Yes, Your Honor, and that's the third claim that I want to get to next. That was Ms. Roy also applied for three positions, but she's only appealed one of those issues, and that was for when she applied for the patient advocate's position at the medical center. Patient advocate is in a completely separate division from the tobacco treatment center. It has nothing to do with tobacco treatment or anything. It's a different division of the hospital. What are they advocating for? They are an advocate for patients that have complaints, concerns. They're kind of a liaison between the patient and the hospital to meet with patients if they have issues, to explain hospital procedures. Unrelated to the tobacco issue? Completely unrelated to the tobacco. This is in our main hospital helping serve our main patient population, kind of a public relations person for patient care that if a patient has issues, they'll help them know who to talk to, who to go to, and likewise help explain university procedures and policies to patients as a go-between to help hopefully facilitate a pleasant patient experience at the hospital. Like a non-secretary. Ma'am? Sounds like a non-secretary. Yes, ma'am. Hospital stay. So she applied for the patient advocate position. It should be noted that there were 43 applications for this position. The position was posted. She applied. She met the minimum qualifications. We don't dispute she met the minimum qualifications. When the position went to the hiring manager, once an application goes through our system and you become system qualified or you met the minimum qualifications, we give the applications to the manager. The manager is not provided with any of the racial or gender demographics of the position. They just get the applications with the requirement or with what they put on paper. The testimony of Dana Phelps, who was the hiring manager for this position, is she reviewed all the applications, including Ms. Roy's, but she did not find Ms. Roy's to be one of the strongest applications on paper. We have presented a chart to the district court that he looked at to show that her application just was not as strong of an application. The one that was selected went into much greater detail, much greater analysis of this prior. What would have been the difference if they had known that she had been riffed? Because there was a preference for employees who had been laid off before. Yes, Your Honor. Under our riff policy, you do get first consideration for positions, but first consideration is not a guarantee of a job. And as the district court correctly noted, she was considered for the position, but she was not deemed to be our strongest applicant. Well, she was considered, but she was considered without the benefit of that, according to your testimony, without the benefit of that little nudge. That is correct. And Ms. Phelps did testify that she was not aware of the riff policy. Why did they hire two bilingual people? Two bilingual? I thought the two white guys who were hired for this were both bilingual. There was only one person hired for this position. Oh, okay. And he was bilingual. Maybe it was the interview process. There were two bilingual. There were four people in the interview process. Right, and two of them had Spanish, I suppose. I believe, and I would stand corrected if I'm wrong, but I believe Mr. Boteler was the only one that was bilingual. Okay. But she was not provided with the demographic information. This was Plaintiff Roy's claim of racial discrimination, and her application was eliminated long before the hiring person didn't know what race she was. And without that knowledge, there can be no reasonable jury could find that we committed racial discrimination against Ms. Roy absent such knowledge. The district court noted that and said that she would lose at this point, but nevertheless, I'll still consider her other arguments. And that's when the court went into the lack of knowledge of the RIF procedures was not determinative of pretext in this case. By looking at the applications, one cannot say that Ms. Roy was clearly more qualified than the person ultimately selected. And by comparing the applications, there was not a reasonable jury could say that this application was so clearly better than the other that there's an inference of racial discrimination. And what they're asking is this court to re-weigh the applications and come up with a different result, but that's not the purpose of the discrimination laws. The purpose of the discrimination laws is to address an inference of discrimination. Without knowing the racial demographics of either of any of the candidates, there can be no racial discrimination at the selection stage. If there's no further questions, Your Honor. Thank you, sir. Back to you, Mr. McCarty. May it please the court. A jury could have found that Ms. Roy was denied this promotion, or really not even denied just the promotion, but the opportunity, because there is nothing in the six pages of the job description questionnaire that has anything close to what their position on appeal is. There is no language in this questionnaire that has anything that you had to have five years of specific employment experience in that department. And if it had said that, frankly, we would not have. What about the language Judge Clement referred to in the letter, in the affidavit? Your Honor, the requirement for us under Burlington is to show that this was pretext. Well, okay, but your only evidence of pretext is the description health specialist in the JDQ, right? Or health services, right? Your Honor, that is the key thing. Well, let me ask you a question about that. Because services normally means things that you're doing for people, and three years of her experience was as a neuroscience researcher, which is not health services in terms of being a nurse or a patient advocate or somebody who's connected with patient care or even outreach. Your Honor, under a very strict view of what experience means, it could be that way. But recall our standard just at this level, Judge, is that we're supposed to look at this evidence in the light most favorable to Ms. Roy. Well, but we're not supposed to, you know, contort things beyond what they mean. Of course not, Your Honor. But even as counsel for the medical center just agreed, she did have multiple years of experience within the medical center. And looking at this evidence, it says health services, five years of experience. There is no special barometer on here, Judge Jones. Suppose she had been a nutritionist for five years. Suppose she had worked for three years. Suppose she had worked in the blood lab for three years. Would all of that mean that she should have been able to prima facie get this leg up? Yes, Your Honor, it does. Under a broad reading in this, Your Honor. Well, who said it has to be broad? I mean, this is whether there can be drawn an inference of intentional discrimination. Your Honor, one of the things that we can look at when we look at the whole of this document, first of all, of course, Your Honor, Rule 56 tells us at this stage we have to look at the evidence very broadly. I understand that, but it still has to be something that gives you, that logically connects with this is an indication of a qualification that they're later changing the goal line on. Chief Judge, my time has lapsed. May I briefly respond? You can always respond to this. Thank you, Your Honor. Where I am in Mississippi sometimes without asking, we do not get to say another word. Judge Jones, what's important here is even on this, on Record Excerpt 16, which is the page that has health services five years of experience, where we see that they could have made it a specific requirement is two lines below. It says you have to have a certificate for the job, CTTS, Certified Tobacco Treatment Specialist. Looking at this evidence, de novo, and in the light most favorable to her, the fact that they use sometimes very specific language, Your Honor, when they use broad language, we can see that they could have selected a specific time bar. They did not in a reasonable jury could have concluded that this was a pretextual reason to keep her out of the job. Okay. All right. We've got you. Thank you, Your Honor. Mr. McCarty and Mr. Whitfield for briefing and argument on the case. It will be submitted. Before we call up the third case, the panel will stand up.